IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| JOHN F. CHASE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Docket No. |
| v. | ) | |
| | ) | |
| ARTHUR MERSON, | ) | |
| | ) | |
| ENDEAVOR PROJECT | ) | |
| CONSULTANTS, LLC | ) | |
| | ) | |
| CHRISTOPHER M. OCHOA, | ) | |
| | ) | |
| THE LAW OFFICE OF CHRIS | ) | |
| OCHOA, P.A. | ) | |
| | ) | |
| RUSSELL HEARLD, | ) | |
| | ) | |
| STELLAR ENTERPRISES, INC., | ) | |
| | ) | |
| MARK CLOUTIER, | ) | |
| | ) | |
| KEITH ROY, | ) | |
| | ) | |
| ROBERT CLOUTIER, and | ) | |
| | ) | |
| DON PATCH | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff John F. Chase, through undersigned counsel, complains as follows against Defendants Arthur Merson; Endeavor Project Consultants, LLC; Christopher M. Ochoa; the Law Office of Chris Ochoa, P.A.; Russell Hearld; Stellar Enterprises, Inc.; Keith Roy; Don Patch; Mark Cloutier; and Robert Cloutier:

1

## NATURE OF THE ACTION

This claim arises from a scheme to defraud Mr. Chase of hundreds of thousands of dollars using the wires of the United States.  Defendants fraudulently induced Mr. Chase to participate in an investment opportunity which the Defendants falsely represented would yield substantial returns with little-to-no risk.  Specifically, Defendants fraudulently stated that for every $250,000 Mr. Chase invested in certain standby letters of credit, he would receive $10,000,000 within 7-12 days.  Defendants' misrepresentations were intended to induce Mr. Chase to part with his money by wiring funds to a participant in the fraudulent scheme.  Mr. Chase in fact relied on Defendants' fraudulent representations and assurances and invested $500,000 of his money in the purported standby letter of credit transactions.  Contrary to the Defendants' representations, Mr. Chase did not receive the promised returns or even a return of any portion of his initial investment.  Defendants' scheme to defraud Mr. Chase is part of a wider pattern and practice by Defendants that they have carried out on a nationwide scale.  The scheme constitutes violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, Maine common law torts, and breach of contract.

## PARTIES

1.      John F. Chase is an individual residing in Naples, Maine.

2.      Arthur Merson is an individual residing in Arizona.

3.      Endeavor Project Consultants, LLC is an Arizona limited liability company with a principal place of business in Arizona

4.      Christopher M. Ochoa is an individual residing in Florida.

5.      Law Office of Chris Ochoa P.A. is a Florida professional association with a principal place of business in Florida.

6.     Russell Hearld is an individual who upon information and belief is residing in either California or Texas.

7.     Upon information and belief, Stellar Enterprises, Inc. is a Texas corporation with a principal place of business in Texas.

8.     Keith Roy is an individual residing in Falmouth, Maine.

9.     Don Patch is an individual residing in Arizona.

10.     Mark Cloutier is an individual residing in Maine.

11.     Robert Cloutier is an individual residing in Maine.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28. U.S.C. § 1331 because this action arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, a law of the United States.

13.     This Court has subject matter jurisdiction over other claims, including claims that involve the joinder of additional parties, under 28 U.S.C. § 1367 since those claims form part of the same case or controversy under Article III of the United States Constitution as those claims over which it has federal question jurisdiction under 28 U.S.C. § 1332.

14.     The Court has personal jurisdiction over the Defendants because they have purposefully availed themselves of this forum by seeking out and contacting Mr. Chase in this District to make him a victim of the scheme that is the subject of this action.

15.     The Court further has personal jurisdiction over the Defendants under 18 U.S.C. § 1965(b) because the ends of justice require that they be brought before the Court.

3

16.     The District of Maine is a proper venue for this action under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in the District of Maine.

## STATEMENT OF FACTS

**I.      Introduction**

17.     Mr. Chase is the owner of Chase Custom Homes & Finance, Inc. in Westbrook, Maine.

18.     In early March 2017, Mr. Chase was contacted by an acquaintance, Defendant Roy, about investing in standby letters of credit.  Mr. Roy told Mr. Chase that the investment would yield a substantial return with little-to-no risk.  Specifically, Mr. Roy stated that Mr. Chase would receive a return of approximately $10,000,000 for every $250,000 he invested.

19.     Mr. Chase was skeptical, but Defendant Roy put Mr. Chase in touch with Defendants Merson and Patch who assured him they had participated in such transactions numerous times before and had never lost money.  They repeated Mr. Roy's assurances that Mr. Chase would receive a return of approximately $10,000,000 for every $250,000 invested.  The Defendants knew that this was not true.

20.     Mr. Chase hired an attorney to assist with further due diligence.  Defendants Merson and Roy made similar misrepresentations to Mr. Chase's attorney as they had to Mr. Chase regarding the proposed letter of credit transactions.

21.     In March 2017 Defendants Merson and Roy introduced Mr. Chase and his attorney to Defendant Ochoa, who at the time was a Florida Attorney.  The Defendants explained that Defendant Ochoa was representing Stellar Enterprises and its principal, Russell Hearld.

12552477.1

Defendant Hearld was to manage the transaction by procuring issuance of the standby letters of credit.  Funds were to be deposited and disbursed through his attorney, Defendant Ochoa.

22.     Based on the fraudulent misrepresentations of the various Defendants, Mr. Chase chose to invest $500,000 in the standby letters of credit.  He signed a contract with several protections in it, including a requirement that his funds would remain in Mr. Ochoa's IOLTA trust account until issuance of the standby letters of credit had been confirmed and a guaranteed return of his investment if the standby letters of credit did not issue within a short time period. Despite these contractual requirements and the Defendants' repeated assurances, Mr. Chase's funds were disbursed from Defendant Ochoa's trust account to various unknown locations on the same day Mr. Chase's attorney wired the funds to Defendant Ochoa.  Shortly thereafter, Defendant Ochoa falsely represented that the standby letters of credit issued.  To this day, the letters of credit have not issued.  Defendants repeatedly told Mr. Chase and his attorney that the transaction had merely been delayed and that his funds would soon be forthcoming.  Yet after nearly a year, Mr. Chase has not received the promised returns, reimbursement of his initial investment, or any confirmation that the letters of credit issued.

23.     Mr. Chase was victimized by a scheme that Defendants have perpetrated against others.  Public records indicate that Mr. Chase is one of multiple victims who have been targeted by the Defendants' standby letter of credit scheme.  Defendant Ochoa's involvement in a virtually identical transaction resulted in his recent disbarment from the Florida Bar.  The record of his disciplinary proceedings indicates that at least Defendants Merson, Hearld, Endeavor Consultants, and Stellar Enterprises were involved in that similar transaction.  Defendants' swindling of their victims violates federal law, and Congress has granted federal courts broad

powers through RICO to afford justice to those like Mr. Chase who have been victimized by such fraudulent schemes.

###### II.      Mr. Chase is Fraudulently Induced to Invest in Standby Letters of Credit

24.      During a Christmas party hosted by Mr. Chase in 2016, Mr. Roy approached Mr. Chase to tell him there was a great opportunity to invest in standby letters of credit.  In early March of 2017, Defendant Roy contacted Mr. Chase by phone to discuss this opportunity.  In the ensuing days, Mr. Roy discussed this opportunity with Mr. Chase by telephone call, text message, and email.  Defendant Roy is acquainted with Mr. Chase because Defendant Roy used to work for Mr. Chases' real estate company.  Defendant Roy stated that if he had the money he would invest in the standby letter of credit deal himself.

25.      When Mr. Chase expressed skepticism about the transaction, Defendant Roy put him in touch with Defendant Merson, owner of Endeavor Project Consultants LLC, and Defendant Patch, a dealer in aircrafts.

26.      Mr. Chase spoke with Defendant Patch by telephone in March 2017.  Defendant Patch falsely stated to Mr. Chase that he had invested in standby letter of credit transactions with Defendant Merson in the past, earning significant returns and never losing a penny from such a transaction.  He further stated that Mr. Merson is a trustworthy man with whom he had intended to invest again.

27.      Defendant Patch expressed confidence about the deal and stated that he was willing to put up some of his own land to secure the deal for Mr. Chase.

28.      Mr. Chase spoke with Defendant Merson almost daily in March of 2017, including by phone calls, text messages, and emails.  Defendant Merson represented to Mr. Chase that the type of standby letter of credit transaction he was proposing had existed since the

12552477.1

1940s.  He represented that he had invested in many of these transactions and had never lost a penny of his or his clients' money.

29.    Defendants Roy, Merson, and Patch each told Mr. Chase that his investment in the proposed standby letter of credit transactions would provide Mr. Chase a substantial return on investment.

30.    Specifically, Defendant told Mr. Roy told Mr. Chase that if he invested $250,000, then he would receive a disbursement $10,000,000 once the standby letter of credit was issued, and that if he invested $500,000, then he would receive a disbursement of $20,000,000 once the standby letter of credit was issued.  Mr. Roy first told this to Mr. Chase during the 2016 Christmas party, and he repeated it by phone, email, and text message in March 2017.  In March 2017 Mr. Roy encouraged Mr. Chase to pursue the latter option.  Mr. Chase had phone calls with Defendants Patch and Merson in March 2017 in which they confirmed what Mr. Roy had said and offered similar encouragement and assurances.  In reliance on these representations, Mr. Chase decided to make a $500,000 investment.

31.    Mr. Chase hired his own counsel, Richard J. Abbondanza, to conduct due diligence on the proposed standby letter of credit transaction.  Attorney Abbondanza spoke with Defendants Merson, Roy, and Patch by telephone in March 2017.  Defendants Merson and Roy explained how standby letters of credit work.  They stated that standby letters of credit provide investors a means of obtaining substantial returns with almost no risk.  Defendants Merson, Roy, and Patch knew that this was not true.

### III.    The Irrevocable 17.5% Success Fee Participation & Payorder Agreement

32.    Defendants Merson and Roy explained to Attorney Abbondanza that in exchange for introducing Mr. Chase to the opportunity, they, Endeavor Project Consultants, and

7

Defendants Patch, Mark Cloutier, and Robert Cloutier (collectively, the "Consultants") would require a collective fee equal to 17.5% of Mr. Chase's proceeds from the transaction.

33.     The Consultants in late March 2017 presented Mr. Chase with an Irrevocable 17.5% Success Fee Participation & Payorder Agreement (the "Success Fee Agreement"), which they said memorialized their entitlement to a collective 17.5% fee for introducing Mr. Chase to the standby letter of credit opportunity.  *See* Success Fee Agreement, attached as **Exhibit 1**.

34.     The Success Fee Agreement stated that "All payments hereunder shall be made pursuant to the above transaction via S.W.I.F.T., or other appropriate and direct wire of funds transfer mechanism . . . ."

35.     The Success Fee Agreement further provided that Defendant Patch would sign a note and mortgage in the amount of $250,000 secured by real estate he owned in Arizona.  In fact, Mr. Patch's real estate in Arizona was worth only approximately $110,000.

36.     Mr. Chase and the Consultants entered the Success Fee Agreement on March 29, 2017.

**IV.     The SBLC Issuance and Delivery Agreement**

37.     In mid-March 2017, Defendant Merson and Defendant Roy introduced Mr. Chase via text message to Defendant Ochoa, then a Florida attorney.

38.     Defendant Ochoa stated that he represented Stellar Enterprises, Inc., on whose behalf he would coordinate the issuance and delivery of the standby letters of credit, including the intake of funds.

39.     Defendant Ochoa represented that he was working with Stellar Enterprises' owner, Defendant Hearld.

12552477.1

40.     Defendant Ochoa presented Mr. Chase and Attorney Abbondanza, with a document titled "SBLC Issuance and Delivery Agreement" (hereinafter, the "SBLC Agreement").  *See* SBLC Agreement, attached as **Exhibit 2.**

41.     The SBLC Agreement provided that Mr. Chase would invest $250,000 to fund a standby letter of credit in the amount of $100,000,000.

42.     An undisclosed private entity was to procure the standby letters of credit and within ten business days after its "validation" pay, through Ochoa and Stellar Enterprises, $10,000,000 to Mr. Chase.

43.     The SBLC Agreement refers to two banking instruments—an "MT-799" and an "MT-760."  The MT-799 is also described in the SBLC Agreement as a "pre-advice," indicating that a bank has certain funds on deposit.  And the MT-760 is the standby letter of credit itself.

44.     The SBLC Agreement required Defendant Ochoa to provide proof of performance to Mr. Chase by providing courtesy copies of the MT-799 and MT-760 as confirmation of their issuance and transmission.   Such confirmation was to be made through bank-to-bank communications through the parties' designated bank officers.

45.     Under the SBLC Agreement, Mr. Chase was to wire the funds he intended to invest—referred to in the Agreement as the "Net Deposit"—to the Law Office of Chris Ochoa P.A.'s IOLTA trust account.

46.     The SBLC Agreement required the Law Office of Chris Ochoa o/b/o Stellar Enterprises to hold Mr. Chase's funds in Ochoa's trust account until confirmed receipt of the MT-799 and MT-760:

> The Net Deposit shall be remitted and entrusted to the Law Office of Chris Ochoa P.A. IOLTA (the "Trust Account") for the benefit of STELLAR ENTERPRISES, INC.  The net deposit amount shall be held in said Trust Account and restricted

9

from disbursement until Wells Fargo, N.A. has confirmed receipt of the MT-799 ("Pre-advice") and the MT-760 SBLC.

*Payee* [The Law office of Chris Ochoa, P.A. Trust Account o/b/o Stellar Enterprises, Inc.] *agrees to provide proof of performance by providing to Payor* [John F. Chase] *the confirmation of transmission of the MT-799 (Pre-Advice and the MT-760 SBCL.*

*If Payee receives no confirmation of the transmission of the above MT-799 and MT-760, Payee shall return to Payor the FULL (100%) Net Deposit with proof of no confirmation from the issuing entities of the MT-799 and MT-760.  FULL Net Deposit shall be made to Payor from Payee within three (3) business days from the 'no confirmation' from issuing entities (Wells Fargo N.A.)*

*When Payee sends the MT-799 and MT-760 confirmations to Payor, Payor agrees to confirm receipt of same within three business days.  Confirmations between Payee and Payor must be done through bank-to-bank communications through their designated bank officers within the allotted time.*

47.    The SBLC Agreement provided that Mr. Chase would receive $10,000,000 for each $250,000 invested within 7-12 banking days of confirmed receipt of the MT-760.

48.    Mr. Chase entered two SBLC Agreements with Stellar Enterprises, through Defendant Ochoa.  Both agreements contained the same terms, and each contemplated Mr. Chase investing $250,000 for a $10,000,000 return.

**V.    Funds are Transferred and Absconded With**

49.    Pursuant to the SBLC Agreements, Mr. Chase on March 29, 2017, transferred the sum of $500,000 to Attorney Abbondanza, and Attorney Abbondanza transferred those funds by bank wire to the IOLTA trust account of the Law Office of Chris Ochoa P.A.

50.    Despite Defendants' Ochoa's and Stellar's contractual obligation to hold Mr. Chase's funds in Defendant Ochoa's trust account until Wells Fargo, N.A. confirmed receipt of the pre-advice and the standby letter of credit, Defendant Ochoa disbursed the funds from his trust account the same day they were wired to him by Attorney Abbondanza.

51.     Mr. Chase in November 2017 filed a complaint with the Florida Bar against Defendant Ochoa.  In response to a subpoena issued in those proceedings, Defendant Ochoa produced bank statements and an IOLTA cash receipts and disbursements journal showing that Mr. Chase's funds were immediately disbursed upon receipt in Mr. Ochoa's Trust Account.

52.     Immediately before receiving Mr. Chase's $500,000 wire on March 29, 2017, Defendant Ochoa had a balance of $6,230 in his trust account.  Immediately after Mr. Chase's wire, Defendant Ochoa had a balance of $506,230 in his Trust Account.  The vast majority of those funds were disbursed on the same day as follows: (1) a disbursement in the amount of $40,000 to a separate bank account of the Law Office of Chris Ochoa, P.A; (2) a disbursement in the amount of $100,000 to The Caswell Group; (3) a disbursement in the amount of $200,000 to Hearld Trade; and (4) a disbursement in the amount of $150,000 to Anderson Law.

53.     Shortly thereafter, Defendant Ochoa represented to Mr. Chase that the MT-799 and MT-760 had been issued, but he did not provide formal confirmation of the transmission as required by the SBLC Agreement.  To this date, Defendant Ochoa has not provided the confirmation of transmission required by the Agreement.

54.     Mr. Chase was not paid a return on his funds as required by the SBLC Agreement.

55.     When payment was not forthcoming as represented by the Defendants and the SBLC Agreement, Mr. Chase and his attorney contacted Defendants Merson, Ochoa, Roy, and Patch to inquire as to when payment would be forthcoming.

56.     From May 2017 through August 2017, Defendants Merson and Ochoa repeatedly represented to Mr. Chase and his attorney that payment was imminent.  Yet the dates on which

they assured Mr. Chase he would be paid invariably came and went with no payment being made.

57.     Defendant Ochoa has ceased communications with Mr. Chase, but Defendant Merson continues to make representations to this day that payment will be coming any day. Defendant Merson has represented that Russell Hearld is coordinating payment with the bank.

58.     Mr. Chase has made demands to Defendants Merson and Ochoa for return of his $500,000 investment, but no portion of those funds has been returned despite assurances from Defendant Merson that it is forthcoming.

59.     Mr. Chase was not paid the disbursement he was entitled to under the Agreement.

60.     Mr. Chase was never provided a copy of the standby letter of credit.

61.     Mr. Chase has not been refunded the principal amount he transferred on March 29, 2017.

**VI.     The Defendants' Swindling of Mr. Chase is Part of a Larger Scheme**

62.     The Defendants' swindling of Mr. Chase is part of a larger scheme by at least Defendants Merson, Ochoa, and Hearld (collectively, the "Enterprise Defendants").

63.     The Enterprise Defendants have engaged in a pattern and practice of fraudulently inducing others to invest in purported standby letter of credit transactions only to abscond with their money just as they did with Mr. Chase's.

64.     On September 4, 2017 an individual named Frank K. Wheaton, on behalf of IntraGlobal Consulting Group, LLC ("IGCG") filed a complaint with the Florida Bar describing a strikingly similar scheme by Defendants Ochoa and Hearld.

12552477.1

65. Like Mr. Chase, IGCG did not receive any return on its investment or have its initial investment returned, despite repeated assurances that his returns, or at least a return of its initial investment, would be forthcoming.

66. Defendant Ochoa's sworn interrogatory responses in that matter describe Russel Hearld as the mastermind behind the scheme, and he provided instructions for money disbursement.

67. Defendant Ochoa's sworn interrogatory responses in that matter further state that Arthur Merson of Endeavor Project Consultants worked with Defendant Hearld in securing the investment and communicating with investors.

68. Records produced by Defendant Ochoa in that matter show that on May 1, 2017, Mr. Wheaton entered into an Irrevocable 20% Success Fee Participation & Payorder Agreement with Defendant Merson and others similar to that Defendant Merson entered with Mr. Chase.

69. Mr. Wheaton also entered into an SBLC Issuance and Delivery Agreement with the Law Office of Chris Ochoa on behalf of Stellar Enterprises, Inc. similar to that Defendants Ochoa and Stellar entered with Mr. Chase.

70. On September 19, 2017 Mr. Ochoa's license to practice law in Florida was suspended indefinitely as a result of Mr. Wheaton's complaint.

71. On February 6, 2018, the Honorable Michael S. Orfinger, Florida Circuit Judge and Referee for the Florida Bar issued a Report of Referee recommending that Defendant Ochoa be disbarred in the State of Florida. *See* Report of Referee, attached hereto as **Exhibit 3**.

72. The Report of Referee describes a scheme strikingly similar to that suffered by Mr. Chase. Mr. Wheaton was told by third-parties that Stellar Enterprises, through Russel Hearld, was seeking investors whose funds would be invested into standby letters of credit that

12552477.1

would be monetized, leveraged and multiplied. **Exh. 3** at 4. Mr. Ochoa's interrogatory responses state that Mr. Merson was one of those third-parties.

73.    Mr. Wheaton was told that he would receive a return of approximately $10 million for each $250,000 invested. *Id.*

74.    The Report of Referee goes on to describe an SBLC Agreement virtually identical to the SBLC Agreements Mr. Chase entered. *See id.* at 4-7.

75.    Defendant Ochoa disbursed Mr. Wheaton's funds from his trust account almost immediately, even though he admitted that neither the MT-799 nor the MT-760 ever materialized. *Id.* at 8-9. The funds were transferred to some of the same entities to whom Mr. Chase's funds were transferred, including Hearld Trade and the Caswell Group. *Id.* at 9.

76.    In the following months, Defendant Ochoa repeatedly told Mr. Wheaton that the transaction had been delayed but the funds would be forthcoming. *Id.* at 10-11.

77.    It was clear to Judge Orfinger, however, that Stellar Enterprises never obtained either the MT-799 or the MT-760. *Id.* at 10.

78.    Judge Orfinger concluded that Defendant Ochoa "unquestionably mishandled" the funds entrusted to him, which "allowed Hearld, and perhaps other person, to abscond with IGCG's funds." *Id.* at 12. He further found that Defendant Ochoa's course of conduct "was designed to delay IGCG's discovery that [Defendant Ochoa] had mishandled its funds and that Hearld had absconded with them." *Id.* at 14.

79.    Judge Ofringer deemed Defendant Ochoa's failure to account for the funds and deliver them to IGCG upon demand to be a conversion. *Id.* at 17.

12552477.1

80.     The Report of Referee references Mr. Chase's Florida Bar Complaint and recognizes that it involves "a transaction with Stellar that is virtually identical to the one involving IGCG." *Id.* at 20 n.6.

81.     The Report of Referee recommended that Defendant Ochoa be disbarred from the practice of law, make restitution in the amount of $1.25 million to IGCG, and pay the Florida Bar's costs in these proceedings.  *Id.* at 27.

82.     On February 9, 2018, Defendant Ochoa filed a notice that he did not contest the Report of Referee and requesting that the Supreme Court of Florida adopt the findings and sanctions recommended by the Referee.

83.     Florida Bar Counsel informed Mr. Chase that Defendant Ochoa's disbarment would deprive the Florida Bar of jurisdiction over Mr. Chase's complaint against Mr. Ochoa. Thus, Mr. Chase will not be able to obtain relief in restitution through the Florida Bar proceedings.

84.     In addition to the virtually identical scheme against Mr. Wheaton and IGCG, there is evidence that Defendants have been other victims.

85.     Correspondence from Defendant Merson himself acknowledges that a number of investors in the standby letter of credit scheme have not received their funds, and some have initiated civil actions or criminal investigations.

86.     Moreover, Defendant Ochoa's law firm bank statements and IOLTA records were produced in the Florida Bar proceedings indicate incoming wire transactions of significant sums of money that would seem to suggest investments from other victims of the standby letter of credit scheme.

12552477.1

## COUNT I
## VIOLATION OF RACKETERR INFLUENCED AND CORRUPT ORGANIZATIONS ACT UNDER 18 U.S.C. § 1962(c)
## (Defendants Hearld, Merson, and Ochoa)

87.     Mr. Chase repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

88.     The Enterprise Defendants have engaged in racketeering activity through the predicate act of mail and wire fraud, 18 U.S.C. §§ 1341, 1343.

89.     The Enterprise Defendants fraudulently induced Mr. Chase to invest his money in a scheme which the Defendants knew would not provide the return promised.

90.     Mr. Hearld made fraudulent statements through his attorney and representative, Mr. Ochoa.

91.     Mr. Chase relied on the fraudulent statements of the Enterprise Defendants in choosing to invest $500,000 with them in standby letters of credit.

92.     Instead of facilitating the issuance and transmission of bank instruments to earn Mr. Chase the promised substantial return on his investment, the Enterprise Defendants absconded with the funds provided by Mr. Chase.

93.     Use of money wires was necessary to implement the Enterprise Defendants' fraudulent scheme, and each defendant participated in the use of the wires or could reasonably foresee its uses in carrying out the scheme.

94.     In addition, the Enterprise Defendants furthered their scheme by making fraudulent statements by email, text message, and telephone calls.

95.     Mr. Hearld has conducted the affairs of Stellar Enterprises through a pattern of racketeering activity, including his scheme to defraud Mr. Chase.

12552477.1

96.     Mr. Merson has conducted the affairs of Endeavor Project Consultants LLC through a pattern of racketeering activity, including his scheme to defraud Mr. Chase.

97.     Mr. Ochoa conducted the affairs of the Law Office of Chris Ochoa P.A. through a pattern of racketeering activity, including his scheme to defraud Mr. Chase.

98.     In addition, the Enterprise Defendants operated an association-in-fact enterprise through which they have carried out their fraudulent schemes.

99.     The association-in-fact enterprise is evidenced by the organizational structure and discrete tasks through which the Enterprise Defendants carry out their schemes, involving Mr. Merson finding investors, Mr. Ochoa serving as the conduit for the funds, and Mr. Hearld as the manager of the operation.

100.    The Enterprise Defendants' RICO violations have caused Mr. Chase significant financial loss.

## COUNT II
## CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT UNDER 18 U.S.C. § 1962(d)
### (Defendants Roy and Patch)

101.    Mr. Chase repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

102.    Mr. Roy and Mr. Patch (collectively, the "Conspiracy Defendants") intentionally furthered the Enterprise Defendants' fraudulent scheme.

103.    Upon information and belief, the Conspiracy Defendants agreed with Mr. Merson to attract investors to the standby letter of credit scheme.

104.    Upon information and belief, the Conspiracy Defendants stood to share in the proceeds of funds invested in this fraudulent scheme, knowing that the purported standby letter of credit transactions and promised returns were a sham.

12552477.1

105.    Mr. Roy initially contacted Mr. Chase in March 2017 and stated that investing in letters of credit would provide Mr. Chase significant returns with almost no risk.  Mr. Roy knew that there was no such opportunity.

106.    Mr. Roy repeated these false claims to Mr. Chase's counsel by email, text message, and phone.

107.    Mr. Roy further introduced Mr. Chase to Mr. Ochoa via text message in furtherance of the conspiracy.

108.    In a March 2017 telephone conversation, Mr. Patch falsely stated to Mr. Chase that he had invested in standby letter of credit transactions with Mr. Merson in the past, earning significant returns and never losing a penny from such a transaction.

109.    Mr. Patch agreed in the Success Fee Agreement that he would secure Mr. Chase's investment with property he represented to be worth $250,000.  Mr. Patch knew that the property was worth just a fraction of that amount.

110.    The Conspiracy Defendants' fraudulent statements were intended to further the Enterprise Defendants' scheme of attracting funds through false promises of substantial returns through standby letters of credit.

111.    Mr. Chase relied on the statements by Mr. Patch and Mr. Roy in choosing to invest $500,000 in standby letters of credit.

112.    Mr. Roy's and Mr. Patch's participation in this RICO conspiracy has caused Mr. Chase significant financial loss.

12552477.1

## COUNT III
## BREACH OF CONTRACT
## (Defendants Ochoa, the Law Office of Chris Ochoa, P.A. and Stellar Enterprises, Inc.)

113.     Mr. Chase repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

114.     Mr. Chase entered into two SBLC Agreements with Mr. Ochoa and the Law Office of Chris Ochoa, P.A., who were acting on behalf of Stellar Enterprises, Inc.

115.     Pursuant to the agreements, Mr. Chase would invest a total of $500,000 for the purpose of issuance and transmission of bank instruments for a $100,000,000 letter of credit.

116.     Stellar Enterprises, through Mr. Ochoa and his firm, agreed to use the funds invested by Mr. Chase to issue and transmit the bank instruments.

117.     The SBLC Agreements required that Mr. Ochoa hold Mr. Chase's funds in his trust account until confirmed receipt of the bank instruments.

118.     The SBLC Agreements provided that Mr. Chase would receive $10,000,000 for each of his two $250,000 investments within seven to twelve banking days of confirmed receipt of one of the bank instruments, the MT-760.

119.     The SBLC Agreements further required Mr. Ochoa to provide courtesy copies of the of the bank instruments to Mr. Chase as confirmation of the transmission and issuance.  Mr. Ochoa's failure to provide such confirmation would entitle Mr. Chase to return of his funds.

120.     Mr. Chase performed his obligations under the SBLC Agreements by wiring funds to Mr. Ochoa's law firm's IOLTA trust account on March 29, 2017.

121.     Mr. Ochoa, the Law Office of Chris Ochoa, and Stellar Enterprises immediately breached the SBLC Agreements by disbursing Mr. Chase's funds the same day they were deposited.

122.     Shortly thereafter, Mr. Ochoa represented that the bank instruments had been issued, yet he failed to provide the Mr. Chase copies of the instruments as required by the SBLC Agreement.   In fact, the bank instruments still have not issued, and the Defendants never intended that they would be.

123.     Despite demands, Mr. Chase has not received the returns promised in the SBLC Agreements

124.     Despite demand, Mr. Chase has not received return of his investment principal, which the SBLC Agreement requires given the failure of Stellar Enterprises, Mr. Ochoa, and his firm to properly confirm issuance of the bank instruments.

125.     Stellar Enterprises, Mr. Ochoa, and the Law Office of Chris Ochoa have breached the SBLC Agreements by failing to return Mr. Chase's funds.

126.     Stellar Enterprises and Mr. Ochoa have further breached the SBLC Agreements by failing to facilitate the $20,000,000 return on Mr. Chase's investment they promised in the SBLC Agreements.

127.     Mr. Chase has suffered significant financial loss caused by Stellar Enterprises' and Mr. Ochoa's breaches of the SBLC Agreements.

**COUNT IV**
**BREACH OF CONTRACT**
**(Defendants Merson, Endeavor Project Consultants, LLC, Roy, Patch**
**Mark Cloutier, and Robert Cloutier)**

128.     Mr. Chase repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

129.     On March 29, 2017, Mr. Chase and the Consultants entered the Success Fee Agreement.

12552477.1

130.    The purpose of that agreement was for the Consultants to introduce Mr. Chase to individuals who would facilitate a lucrative and low-risk standby letter of credit investment in exchange for Mr. Chase's payment of a fee to the Consultants.

131.    The Consultants breached the Success Fee Agreement by failing to place Mr. Chase with the type of investment opportunity they had promised.

132.    The Consultants placed Mr. Chase with an investment which, upon information and belief, each Consultant knew was part of a fraudulent scheme that would deprive Mr. Chase of a return of even his initial investment.

133.    As a result of the Consultants' breach of the Success Fee Agreement, Mr. Chase has suffered significant financial loss.

**COUNT V**
**FRAUDULENT INDUCEMENT**
**(Defendants Merson, Ochoa, Hearld, Roy, Patch, Endeavor Project Consultants, LLC**
**Stellar Enterprises, Inc., and the Law Office of Chris Ochoa, P.A.)**

134.    Mr. Chase repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

135.    As set forth in the previous paragraphs, Defendants Ochoa, Hearld, Roy, Patch, Endeavor Project Consultants, LLC, Stellar Enterprises, Inc. and the Law Office of Chris Ochoa, P.A. each made multiple misrepresentations to Mr. Chase concerning the purported standby letter of credit transactions they proposed he invest in.   Each Defendant stated that the investment involved little-to-no risk and would result in a return of $10,000,000 for every $250,000 Mr. Chase invested.

12552477.1

136.    The Defendants knew their representations concerning the proposed investment were false.  They knew that Mr. Chase would see no return on his investment or, at best, would see only a return of his principal investment.

137.    The Defendants made their misrepresentations concerning the investment for the purpose of inducing Mr. Chase to invest his money in the purported standby letter of credit transactions.  Upon information and belief, each of the Defendants stood to gain financially by defrauding Mr. Chase out of his money.

138.    Mr. Chase justifiably relied on the Defendants' misrepresentations as true and invested $500,000 in the purported standby letters of credit based on those representations, causing Mr. Chase significant financial loss.

**COUNT VI**
**NEGLIGENT MISREPRESENTATION**
**(Defendants Merson, Ochoa, Hearld, Roy, Patch, Endeavor Project Consultants, LLC**
**Stellar Enterprises, Inc., and the Law Office of Chris Ochoa, P.A.)**

139.    Mr. Chase repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

140.    As set forth in the previous paragraphs, Defendants Ochoa, Hearld, Roy, Patch, Endeavor Project Consultants, LLC, Stellar Enterprises, Inc. and the Law Office of Chris Ochoa, P.A. each made multiple misrepresentations to Mr. Chase concerning the standby letter of credit transactions they proposed he invest in.  Each Defendant stated that the investment involved little to no risk and would result in a return of $10,000,000 for every $250,000 Mr. Chase invested.

141.    The Defendants knew, or in the exercise of reasonably care or competence should have known, their representations concerning the proposed investment were false.

12552477.1

142.    Mr. Chase justifiably relied on the Defendants misrepresentations as true and invested $500,000 in the purported standby letters of credit based on those representations, causing Mr. Chase significant financial loss.

## COUNT VII
## UNFAIR TRADE PRACTICES
### (Defendants Merson, Ochoa, Hearld, Roy, Patch, Endeavor Project Consultants, LLC Stellar Enterprises, Inc., and the Law Office of Chris Ochoa, P.A.)

143.    Mr. Chase repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

144.    The Defendants aforementioned misrepresentations concerning the purported standby letters of credit transactions were made in the conduct of trade or commerce.

145.    The Defendants' misrepresentations concerning the purported standby letters of credit transactions constitute unfair and deceptive trade practices.

146.    The Defendants' unfair and deceptive trade practices cause Mr. Chase significant financial loss.

## COUNT VIII
## CONVERSION
### (Defendants Merson, Ochoa, Hearld, Roy, Patch, Endeavor Project Consultants, LLC Stellar Enterprises, Inc., and the Law Office of Chris Ochoa, P.A.)

147.    Mr. Chase repeats and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

148.    Mr. Ochoa took possession of $500,000 from Mr. Chase on March 29, 2017.

149.    Mr. Chase was entitled to retake possession of the property upon Mr. Ochoa's failure to provide courtesy copies of bank instruments as confirmation of their issuance as required under the SBLC Agreement.

12552477.1

150.    Upon information and belief, all Defendants have taken some portion of the funds provided by Mr. Chase.

151.    Mr. Chase has made demand upon all Defendants for return of funds, yet each has failed to return the funds.

WHEREFORE, Mr. Chase demands a jury trial on all issues so triable and that judgment be entered:

A.  Awarding damages to Mr. Chase in an amount to be proved at trial;

B.  Awarding trebling of the damages Mr. Chase proves at trial;

C.  Awarding Mr. Chase punitive damages in an amount to be proved at trial;

D.  Awarding Mr. Chase the costs of suit and his reasonable attorneys' fees;

E.  Awarding pre-judgment and post-judgment interest; and

F.  For such other and further relief as the Court may deem proper

Dated: April 19, 2018

Respectfully submitted,

*/s/ Benjamin S. Piper*
Timothy J. Bryant, Esq.
Benjamin S. Piper, Esq.
Attorneys for John F. Chase
PRETI FLAHERTY BELIVEAU & PACHIOS, LLP
One City Center, P.O. Box 9546
Portland, ME  04112-9546
Tel: (207) 791-3000
tbryant@preti.com
bpiper@preti.com

12552477.1