UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

JOHN F. CHASE, )
)
       Plaintiff )
)
v. ) No. 2:18-cv-00165-NT
)
ARTHUR MERSON, et al., )
)
       Defendants )

*MEMORANDUM DECISION AND ORDER ON MOTIONS FOR ENTRY OF DEFAULT AND DEFAULT JUDGMENT AND MOTION TO EXTEND TIME TO FILE ANSWER*

In this case alleging that the defendants conspired to induce the plaintiff, John F. Chase, into investing $500,000 in a fraudulent investment scheme, *see* Complaint (ECF No. 1) at 2, defendant Robert Cloutier moved for an extension of time to answer the complaint *nunc pro tunc*, and, nearly simultaneously, the plaintiff moved for both the entry of default and default judgment against him, *see* Defendant Robert Cloutier's Motion To Extend Deadline To Answer or Otherwise Respond to Complaint ("Motion To Extend Time") (ECF No. 12); Application for Entry of Default and Default Judgment Against Plaintiff Robert Cloutier ("Default Motions") (ECF No. 15). I held oral argument on the motions following which I granted the defendant's motion and deemed the plaintiff's motions moot, *see* ECF No. 33, and now set forth in writing the bases for my oral ruling.

**I. Background**

The plaintiff filed the instant complaint on April 19, 2018, alleging that 10 named defendants fraudulently induced him to invest $500,000 in standby letters of credit by promising a $10 million return in seven to 12 days on every $250,000 invested. *See* Complaint at 2. The plaintiff alleges, in relevant part, that:

1

1. Defendants Arthur Merson and Keith Roy informed his attorney that, in exchange for introducing him to this opportunity, they and four other defendants, Endeavor Project Consultants, LLC, Don Patch, Mark Cloutier, and Robert Cloutier (together, the "Consultants"), would require a collective fee of 17.5 percent of the plaintiff's proceeds from the investment. *See id.* ¶ 32.

2. In late March 2017, the Consultants presented him with an Irrevocable 17.5% Success Fee Participation & Payorder Agreement (the "Success Fee Agreement"). *See id*. ¶ 33 & Success Fee Agreement, Exh. 1 (ECF No. 1-1) thereto.

3. On March 29, 2017, he and the Consultants executed the Success Fee Agreement, and, pursuant to a separate agreement with defendant Stellar Enterprises, Inc., through defendant Christopher M. Ochoa, he wired $500,000 to the IOLTA trust account of defendant The Law Office of Chris Ochoa, P.A., the same day. *See* Complaint ¶¶ 36, 48-49.

4. Pursuant to that separate agreement, the plaintiff's funds were not to be disbursed from the trust account until Ochoa provided him proof that two banking instruments, including a standby letter of credit, had been issued and transmitted. *See id*. ¶¶ 43-44, 46.

5. In fact, the plaintiff's funds were immediately disbursed from the trust account without the promised proof, and, as of the date of the filing of the instant complaint more than a year later, despite inquiries and/or demands, the plaintiff still had not received proof of the issuance and transmission of the banking instruments, any return on his investment, or a refund of any portion of the $500,000 that he invested. *See id.* ¶¶ 50, 52-54, 58-61.

Robert Cloutier was served with a summons and copy of the complaint on April 30, 2018, triggering a May 21, 2018, deadline to answer, *see* ECF No. 6, and Mark Cloutier was served on

May 7, 2018, resulting in a May 29, 2018, deadline to answer, *see* ECF No. 8. According to Robert Cloutier, the following series of events then transpired:

1. He and Mark Cloutier, who is his brother, reviewed the complaint together and discussed how to respond.[1] *See* Declaration of Robert Cloutier (ECF No. 24-1), attached to Defendant Robert Cloutier's Objection to Application for Entry of Default and Default Judgment ("Defendant's Objection") (ECF No. 24), ¶¶ 3-4.[2] They agreed that Mark, who was more experienced in legal matters, would coordinate with their cousin Jim Cloutier, an attorney, to respond appropriately to the complaint and protect their rights. *See id.* ¶¶ 15, 17.

2. Robert did not focus on the fact that he had apparently been served with the complaint a few days earlier than Mark and that, as a result, his response was due sooner. *See id.* ¶ 16.

3. When Robert and Mark learned that Jim Cloutier was unable to represent them because of a conflict of interest, Mark called the plaintiff's attorney and advised that he and Robert needed more time to find counsel and respond. *See id.* ¶¶ 17-18. The plaintiff's attorney agreed to give Mark additional time to do so. *See id.* ¶ 18. Mark reassured Robert that, although the plaintiff's attorney had told him that Robert's response was already "one day late," he (the plaintiff's attorney) would "not enforce it." *Id.*

---

[1] For ease of reference, I hereinafter refer to Mark Cloutier as "Mark" and Robert Cloutier as "Robert."

[2] Although Robert's affidavit was filed in support of his opposition to the plaintiff's motions for the entry of default and default judgment against him, the facts presented therein were integral to the consideration of all three related motions. Hence, I took that affidavit, as well as a responsive affidavit of Attorney Piper, *see* Declaration of Benjamin S. Piper ("Piper Decl.") (ECF No. 27-1), attached to Plaintiff[]'s Reply in Support of Application for Entry of Default and Default Judgment (ECF No. 27), into account in ruling on Robert's motion to extend time.

4. At Mark's suggestion, Robert promptly called the plaintiff's attorney and was told that because he was already "a day late[,]" he would simply have to explain why he was a day or two late and would be allowed to go forward, or words to that effect. *See id*. ¶ 19.

5. Robert felt reassured and believed the matter was under control, and was surprised to learn that the plaintiff was seeking a default judgment against him. *See id*. ¶¶ 20-21.

Plaintiff's attorney Benjamin Piper confirms that, on Friday, May 25, 2018, prior to the Memorial Day weekend, he received separate calls from both Mark and Robert. *See* Piper Decl. ¶¶ 2, 6. However, his account of those conversations differs in some respects from that set forth by Robert, and he describes a further conversation with each brother on Tuesday, May 29, 2018. *See id*. ¶¶ 3-16. Specifically, he avers that:

1. On May 25, 2018, he told Mark that he needed to speak with the partner managing the case, Attorney Timothy Bryant, to determine whether the requested extension was acceptable but that, because Mark's deadline to respond did not expire until May 29, 2018, he would not seek to default him before he got back to him regarding his request for an extension. *See id*. ¶¶ 3-4. Mark did not purport to be seeking an extension on Robert's behalf, and Attorney Piper did not make any representation regarding the plaintiff's position as to Robert. *See id*. ¶ 5.

2. When Robert called Attorney Piper minutes later, seeking an extension of time to respond to the complaint, Attorney Piper informed him that he could not tell him at that time whether the plaintiff would grant him an extension. *See id*. ¶¶ 6, 8-9. Attorney Piper also told Robert that (i) his deadline to respond had expired four days earlier, (ii) if he wished to defend himself, he would need to get an attorney or otherwise appear as soon as possible, and (iii) there could be consequences for his failure to serve a timely response. *See id*. ¶ 9. He denies assuring Robert that the plaintiff would not seek a default against him or telling him that his response to the

complaint was only one day late and that he would simply have to explain his lateness to the court and would be allowed to go forward. *See id*. ¶¶ 10-12. He did tell Robert that an explanation for his lateness likely would be necessary, but not necessarily sufficient, to allow him to go forward. *See id*. ¶ 12.

3. Attorney Piper again spoke separately with both Mark and Robert on May 29, 2018, advising Mark that the plaintiff would give him an extension until June 1, 2018, to find counsel and would consider a further extension request from counsel, and advising Robert that, because his deadline to respond to the complaint had expired before he requested an extension, the plaintiff would not consent to an extension. *See id*. ¶¶ 13-15.

Following the Cloutier brothers' conversations with Attorney Piper, they retained Attorney Edward MacColl, who entered an appearance on their behalf on May 31, 2018, 10 days after Robert's answer was due and a day prior to the June 1, 2018, extension of Mark's deadline to retain counsel to which the plaintiff had agreed. *See* ECF Nos. 13, 14. That same day, Attorney MacColl filed Robert's motion to extend time, time-stamped at 2:04 p.m. *See* ECF No. 12. The plaintiff filed his motions for the entry of default and default judgment against Robert later that afternoon, time-stamped at 3:15 p.m. *See* ECF No. 15. Mark's consented-to motion to extend the deadline to answer was filed on June 1, 2018, *see* ECF No. 17, and was granted, extending his deadline to June 14, 2018, *see* ECF No. 20. Mark and Robert filed their consolidated answers to the complaint on June 13, 1018. *See* ECF No. 29.

## II. Applicable Legal Standard

Because Robert's motion to extend time was filed after the expiration of his deadline to answer the complaint, Federal Rule of Civil Procedure 6(b)(1)(B) applies. That rule states: "When an act may or must be done within a specified time, the court may, for good cause, extend the time

5

. . . on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B).

### III. Discussion

Although Robert's motion and those of the plaintiff were filed nearly simultaneously, Robert's was filed first, and so I consider it first. Because I find it meritorious, the plaintiff's motions for competing relief are moot.

As Robert observed, *see* Defendant Robert Cloutier's Reply Memorandum in Support of Motion To Extend Deadline ("Defendant's Reply") (ECF No. 28) at 1, "excusable neglect" is an "elastic concept" that "is not limited strictly to omissions caused by circumstances beyond the control of the movant[,]" *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S 380, 392 (1993) (footnotes and internal quotation marks omitted). Indeed, the Supreme Court has explained:

> [T]he determination is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission. These include . . . the danger of prejudice to [the nonmovant], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

*Id.* at 395 (citation and footnotes omitted).

Each of these factors favor Robert.

First, there is minimal delay or prejudice to the plaintiff. As of the date Robert filed the instant motion, no defendant had answered the complaint; as of the time of oral argument, only two had answered: Robert and Mark. The plaintiff confirmed at oral argument that he was likely to seek leave from the court to serve several of the defendants by alternative means because he had not as yet been able to locate them, and he has now done so. *See* Motion to Extend Time for

Service of Process and to Authorize Service by Publication (ECF No. 37). In short, this case has just begun.

Nor has the plaintiff shown "prejudice" for purposes of Rule 6(b)(1)(B), which "does not refer to a situation in which the party who would obtain a legal advantage from default is deprived of that advantage." *Robinson v. Wright*, 460 F. Supp.2d 178, 180 (D. Me. 2006) (citation omitted). "Instead, cognizable prejudice is, for example[,] lost evidence." *Id.* (citations and internal punctuation omitted). There has been no such showing here. At oral argument, the plaintiff identified only the cost and time entailed in filing his motions for default and the entry of default against Robert.

The First Circuit has characterized the next relevant *Pioneer* factor, "the asserted reason for the mistake[,]" as "by far the most critical[.]" *Dimmitt v. Ockenfels*, 407 F.3d 21, 24 (1st Cir. 2005). However, contrary to the plaintiff's assertion at oral argument, excusable neglect does not categorically exclude any mistake that is of the party's own making. *See, e.g.*, *Pratt v. Philbrook*, 109 F.3d 18, 19 (1st Cir. 1997) ("The [Supreme] Court declined to limit the 'neglect' which might be excusable to those circumstances caused by intervening circumstances beyond a party's control.") (discussing *Pioneer Investment*).

Instead, recognizing that excuses for a late filing could range from "an act of God or unforeseeable human intervention" at one end of the spectrum to "simply . . . choos[ing] to flout a deadline" at the other, the Supreme Court held that the range of conduct in between, including "late filings caused by inadvertence, mistake, or carelessness[,]" could, "where appropriate," constitute "excusable *neglect*." *Pioneer*, 507 U.S. at 387-88 (emphasis added).

The delay at issue here was not the result of forces beyond Robert's control; however, it also was not the result of indifference to the matter of the need to respond to the complaint. Even

accepting Attorney Piper's version of events, it is clear that Robert made substantial efforts to determine what was required of him once he was served with a lawsuit. He coordinated with his co-defendant brother, who was more experienced in legal matters; they sought representation by their cousin, whom they assumed for some period of time would serve as their attorney; upon learning that their cousin could not do so, they both separately called and spoke with the plaintiff's attorney; and, despite the fact that this is not a garden-variety civil lawsuit, potentially complicating a search for an attorney able and willing to take the case, they then swiftly engaged Attorney MacColl.

On either Robert's or Attorney Piper's version of events, Attorney Piper did not inform Robert on May 25, 2018, that the plaintiff would either refuse to consent to an extension or seek a default judgment against him. Robert, a non-lawyer relying in part on his non-lawyer brother Mark's understanding of his separate conversation that day with Attorney Piper, plausibly, albeit mistakenly, could have believed that the representations Attorney Piper made to Mark pertained to him as well and that Attorney Piper's warnings that he needed to obtain counsel and present an excuse for his tardiness to the court constituted an assurance that he could go forward. Within two days of the date on which Attorney Piper did inform Robert that the plaintiff would not consent to his requested deadline extension, the brothers had secured the services of Attorney MacColl.

Considering Robert's status as a non-lawyer, this series of actions can fairly be characterized as diligent, and demonstrate a good-faith effort to comply with the deadline at issue.

The *Pioneer* factors, hence, all favor Robert.

Beyond this, Robert persuasively argued that the entry of default, and a default judgment against him for $500,000, would be unjust in view of the minimal part he is alleged to have played

in a complex multi-defendant scheme and his identification of what he believes to be substantial defenses to that claim. *See* Motion To Extend Time at 1-2; Defendant's Reply at 2-3.

As Robert noted, *see* Motion To Extend Time at 2, he is named as a defendant in only one of the plaintiff's eight causes of action, for breach of contract, *see* Complaint ¶¶ 87-151. He asserts that he has substantial defenses to that claim, including (i) the plaintiff's failure to engage in binding arbitration as required by the contract at issue, (ii) the plaintiff's reliance on breach of a "purpose" that is not enumerated within the four corners of the contract, which contains an integration clause, and (iii) the plaintiff's failure to identify any provision or term of the contract that Robert breached. *See* Motion To Extend Time at 2; Defendant's Reply at 3; Defendant's Objection at 4-5, 9-10.

Although the notions of unjust outcomes and substantial defenses are not among the non-exhaustive list of factors enumerated in *Pioneer*, the determination of whether to grant a party's motion under Rule 6(b)(1)(B) "is at bottom an equitable one[.]" *Pioneer*, 507 U.S at 395. At oral argument, I found Robert's argument that the denial of his motion would be harsh and inequitable given these circumstances persuasive, further tipping the balance in favor of the grant of his motion.

In sum, because Robert made a good-faith effort to comply with his deadline to answer the plaintiff's complaint, any delay in the case or prejudice to the plaintiff is minimal, and the denial of the motion is not in the interests of justice in view of the size of the default judgment sought and Robert's representation that he has substantial defenses to the sole claim against him, I exercised the discretion conferred by Rule 6(b)(1)(B), *see, e.g., Cordero-Soto v. Island Fin., Inc.*, 418 F.3d 114, 117 (1st Cir. 2005), to grant his motion.

## IV. Conclusion

For the reasons articulated above, I **GRANTED** Robert's motion to extend the deadline to file his answer *nunc pro tunc*, permitting his answer of June 13, 2018, to stand, and **DEEMED** the plaintiff's motions for the entry of default and default judgment against Robert **MOOT**.

## *NOTICE*

*In accordance with Federal Rule of Civil Procedure 72(a), a party may serve and file an objection to this order within fourteen (14) days after being served with a copy thereof.*

*Failure to file a timely objection shall constitute a waiver of the right to review by the district court and to any further appeal of this order.*

Dated this 15th day of July, 2018.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge