# UNITED STATES DISTRICT COURT

# DISTRICT OF MAINE

| | |
|---|---|
| JOHN F. CHASE, | ) |
|                     PLAINTIFF | ) |
| v. | )    CIVIL NO. 2:18-CV-165-DBH |
| ARTHUR MERSON, ET AL., | ) |
|                     DEFENDANTS | ) |

## DECISION AND ORDER ON DEFENDANTS DON PATCH'S, KEITH ROY'S, ARTHUR MERSON'S, AND ENDEAVOR PROJECT CONSULTANTS LLC'S MOTIONS TO DISMISS

In securities cases, the Private Securities Litigation Reform Act of 1995 (PSLRA) pre-empts civil relief for fraud that the Racketeer Influenced and Corrupt Organizations Act (RICO) previously made available. As a result, a court confronted with a motion to dismiss a RICO fraud claim because of the PSLRA must parse the would-be RICO claim to determine whether it is covered by the PSLRA. The First Circuit calls this "a sort of reverse Rule 12(b)(6) inquiry: we ask whether the conduct in question would be 'actionable as fraud in the purchase or sale of securities,' in which case a RICO count based on such fraud as a predicate act is not actionable." Calderon Serra v. Banco Santander Puerto Rico, 747 F.3d 1, 4 (1st Cir. 2014). One challenge in identifying PSLRA-covered securities claims involves applying the Supreme Court's definition[1] of the term "investment contracts," one of the investment devices governed by federal

---

[1] It appears in SEC v. W.J. Howey Company, 328 U.S. 293 (1946).

securities laws. The challenge is compounded in cases like this, where the promised investment opportunity is so blatantly fraudulent that there is no real benchmark against which to measure whether it is RICO fraud or a PSLRA investment.[2]

The plaintiff filed this federal lawsuit alleging RICO violations, breach of contract, fraudulent inducement, negligent misrepresentation, unfair trade practices, and conversion against a number of defendants. Compl. ¶¶ 87-151 (ECF No. 1). Several of the principal defendants he accuses of fraud have defaulted. I previously granted two defendants' 12(b)(6) motions to dismiss.[3] Feb. 6, 2019 Dec. & Order on Cloutier Defs.' Mot. to Dismiss (ECF No. 84). Now, another defendant, Donald Patch, has moved to dismiss the RICO claims because of the PSLRA. Def. Patch's Mot. to Dismiss at 1 (ECF No. 83). Patch argues that without those federal claims this court lacks subject matter jurisdiction. Id. Other defendants have joined his argument. See Def. Roy's Mot. to Dismiss at 1 (ECF No. 104); Merson Defs.' Mem. of Law on Subject Matter Jurisdiction at 7 (ECF No. 105).

---

[2] The United States Court of Appeals for the Seventh Circuit confronted this issue in SEC v. Lauer, 52 F.3d 667 (7th Cir. 1995). It stated:
> The case is surprisingly novel, involving as it does a degree of fraud so complete and barefaced that it ordinarily would be dealt with under the mail or wire fraud statutes or other criminal statutes not specialized to the securities market—indeed a fraud so thoroughgoing, pure, and barefaced as to raise the question whether it can be considered to have involved "securities" at all.

Id. at 669. But it went on to rule that "[i]t would be a considerable paradox if the worse the securities fraud, the less applicable the securities laws," and that "it is the representations made by the promoters, not their actual conduct, that determine whether an interest is an investment contract (or other security)." Id. at 670.

[3] The plaintiff had charged them only with breach of contract, and I ruled that he had shown no contractual provision they had breached. See Feb. 6, 2019 Dec. & Order on Cloutier Defs.' Mot. to Dismiss at 2 (ECF No. 84).

After full briefing, I **GRANT** the motions to dismiss the RICO claims. I reserve decision on the motions to dismiss the remaining state law claims until I determine whether the plaintiff can maintain federal jurisdiction based upon diversity of citizenship.[4]

## SUMMARY OF COMPLAINT ALLEGATIONS[5]

The plaintiff says that the defendants fraudulently induced him to participate in an investment opportunity. The promised return was literally unbelievable. Specifically, for every $250,000 he invested, he would receive approximately $10,000,000 in 7 to 12 days. Compl. ¶ 18. The route to this fortune was through so-called monetized[6] Standby Letters of Credit (SBLC).[7] The

---

[4] He says that he is prepared "to amend" his filings "to invoke jurisdiction on the basis of diversity of citizenship." Pl.'s Opp'n to Def. Roy's Mot. to Dismiss (ECF No. 106).

[5] Like Lauer, note 2 supra, I focus on the promoters' alleged representations.

[6] Variations of this term appear in the SBLC Issuance and Delivery Agreement (ECF No. 1-2) and the Irrevocable 17.5% Success Fee Participation Agreement (ECF No. 1-1), both of which the plaintiff signed.

[7] This fraud is not unique to Maine and Florida. See, e.g., SEC v. Cooper, 142 F. Supp. 3d 301, 308 (D.N.J. 2015) ("The purported investments involved the purchase of bank instruments, including 'standby letters of credit' ('SBLCs') and 'bank guarantees', from major international banks. The instruments were to be 'monetized' or 'traded' on a 'platform' generating astronomical profits from complex and secretive transactions.") (internal citations omitted). These SBLC schemes appear to be akin to so-called Prime Bank or High Yield schemes. See, e.g., SEC v. Milan Group, Inc., 962 F. Supp. 2d 182, 194 (D.D.C. 2013) (testimony by an expert that the "defining characteristic … is the promise of a disproportionate return without risk or with low risk from a source which is obscure or unable to be ascertained objectively.") The Milan court further explained that:

> "[S]ome of the instruments . . . such as standby letters of credit and bank guarantees are not traded." Standby letters of credit are a "promise to honor a timely presentation of documents that comply with the terms and conditions of the undertaking," thereby assuring performance or payment. "They are specialized promises that only run to the named beneficiary, are not transferable unless they expressly so state and then only with the consent of their issuer," and they expire on a date certain agreed to by the parties. Most critically, [expert testimony] is absolutely clear that:
>
>> [Standby Letters of Credit] are not investments, they do not pay interest, they are not discounted, they are not traded or bought and sold, there is no market in which they are traded or could be traded even were they freely transferable and freely drawable (which is most unlikely) because each must be evaluated individually and in light of its terms and the transactions which [it]

3

plaintiff entered into an SBLC Issuance and Delivery Agreement. See Compl. Ex. 2 (ECF No. 1-2.) It told him to wire his $250,000 to a Florida lawyer's trust account, Compl. Ex. 2; that an undisclosed private entity would then apply for a $100 million standby letter of credit from Credit Suisse AG, id. at 2; and that upon proof of its issuance the undisclosed entity would then pay the Florida lawyer's trust account $10 million for the plaintiff, calculated as 25% of the $100 million, "less fees to participants," id. The plaintiff also signed an Irrevocable 17.5% Success Fee Participation Agreement, Compl. Ex. 1 (ECF No. 1-1), by which he agreed to pay 17.5% of any profits he received to various consultants. The plaintiff then sent $500,000 (two $250,000 transactions) to the Florida lawyer's trust account. Compl. ¶ 49. After many months and unsuccessful demands, he has received nothing in return. He has learned that the lawyer's trust account has been depleted, that at least one other investor fell for the ruse to the tune of $1.25 million, also with nothing to show for his investment, and that the Florida lawyer whose trust account was used has since been disbarred. See Compl. Ex. 3 at 3-4 (ECF No. 1-3).

## ANALYSIS

The PSLRA preempts civil RICO claims for fraud in securities transactions. I cannot improve on the United States Court of Appeals for the Third Circuit's useful and succinct description of the interaction between the two statutes:

---

support[s]. While [Standby Letters of Credit] are used to assure performance, banks do not issue them unless there is a dependable means of reimbursement and their issuance is treated like a loan.)
Id. at 195.

4

> Prior to 1995, a private plaintiff could assert a civil RICO claim for securities law violations sounding in 'garden variety' fraud. Inasmuch as 'fraud in the sale of securities' was a predicate offense in both criminal and civil RICO actions, plaintiffs regularly elevated fraud to RICO violations because RICO offered the potential bonanza of recovering treble damages. However, in 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA"). The PSLRA amended RICO by narrowing the kind of conduct that could qualify as a predicate act. Section 107 of the PSLRA (known as the "RICO Amendment") amended 18 U.S.C. § 1964(c), to provide in relevant part as follows:
>
> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States District Court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, *except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962* [RICO's prohibited activities section]."

Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc., 189 F.3d 321, 327 (3rd Cir. 1999) (emphasis in original; internal citations omitted). The "RICO Amendment," as quoted in italics, remains in effect.

So the issue I confront on the motions to dismiss is whether the RICO counts in the plaintiff's Complaint[8] "rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities." Id. Perhaps the closest appellate case to this one is a 1995 Seventh Circuit decision. In SEC v. Lauer, 52 F.3d 667 (7th Cir. 1995), certain defendants and entities promoted a "program [that] purported to invest in 'Prime Bank Instruments,' a nonexistent high-yield security," "promising an annual return of 60 percent on the minimum investment, which was $10 million." Id. at 669. Investors were solicited to

---

[8] There are two RICO counts: a substantive RICO count (Count I) against three defendants, only one of whom (Merson) has not defaulted, and a RICO conspiracy count (Count II) against two defendants, Roy and Patch, who are alleged to have furthered the scheme asserted in Count I. Compl. ¶¶ 87-112.

"invest $10 million (or more) with Konex, which would use the money to buy Prime Bank Instruments." Id. at 670. The Seventh Circuit rejected the argument that the scheme was not the sale of securities even though "Prime Bank Instruments do not exist." Id. It said: "A central purpose of the securities laws is to protect investors and would-be investors in the securities markets against misrepresentations. An elementary form of such misrepresentation is misrepresenting an interest as a security when it is nothing of the kind. . . . The effect [of what the promoter told the investor] was to represent [the investor's] interest as being an investment contract. It was nothing of the kind. It was the perilous deposit of money with a fraud." Id. at 670-71.

As in Lauer, the fraud element is clearly satisfied here. Was the fraud practiced on this plaintiff "in the sale or purchase of securities"? Certainly, the alleged transaction was not the typical stock sale or purchase. But federal securities laws include "investment contracts" (the type of security in Lauer) under the rubric "securities." 15 U.S.C. §§ 77b(a)(1) (Securities Act of 1933); 78c(a)(10) (Securities Exchange Act of 1934). The federal statutes do not define that term, which came from state securities law decisions that predated the federal statute, see Louis Loss, Joel Seligman, & Troy Paredes, Securities Regulation (5th ed. 2018), at 1059 n. 121. But in 1946, the Supreme Court defined it in SEC v. W.J. Howey Company, 328 U.S. 293 (1946).

According to Howey, there are three elements: "The test is whether the scheme involves [1] an investment of money in [2] a common enterprise with [3] profits to come solely from the efforts of others." Id. at 301. As the Supreme Court later described it in 1985, the determinative factor was that "looking at

6

the economic realities, the transaction 'involve[d] an investment of money in a common enterprise with profits to come solely from the efforts of others,'" distinguishing it from circumstances where "the economic realities of the transaction showed that the purchasers had parted with their money not for the purpose of reaping profits from the efforts of others, but for the purpose of purchasing a commodity for personal consumption." Landreth Timber Co. v. Landreth, 471 U.S. 681, 689 (1985); see also id. at 690-91 (distinguishing United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 858 (1975)[9]). Moreover, the Supreme Court has said that "Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called." Reves v. Ernst & Young, 494 U.S. 56, 61 (1990) (emphasis in original).[10]

---

[9] In United Housing Foundation, Inc. v. Forman, 421 U.S. 837 (1975), the Supreme Court said: "What distinguishes a security transaction—and what is absent here—is an investment where one parts with his money in the hope of receiving profits from the efforts of others, and not where he purchases a commodity for personal consumption or living quarters for personal use." Id. at 858. In this case, Chase invested his money on a promise of extraordinary profits, not to purchase something for his personal use or consumption.

[10] I recognize that letters of credit themselves are not securities. See, e.g., Leslie v. Minson, 679 F. Supp. 280, 287 (S.D.N.Y. 1988). But the defendants here were not selling letters of credit (although the Complaint sometimes loosely suggests that). See, e.g., Compl. ¶ 24 ("a great opportunity to invest in standby letters of credit"). The Complaint's more detailed allegations make clear that Chase understood the defendants were offering him participation in a scheme (not completely defined) where some other, undisclosed, entity would invest in standby letters of credit, "monetize" them, and return some of the profits to him. See, e.g., id. ¶ 42: "An undisclosed private entity was to procure the standby letters of credit and within ten business days after its 'validation' pay, through Ochoa and Stellar Enterprises, $10,000,000 to Mr. Chase." See also id. ¶ 46 (plaintiff gets only confirmation of transmission of documents to Wells Fargo, N.A.). See also Compl. Ex. 2 (the SBLC Issuance and Delivery Agreement he signed); Compl. ¶ 72 (his description of the parallel investment by another investor and the Florida Referee's finding in the Florida lawyer's disbarment proceeding that the SBLCs were to "be monetized, leveraged and multiplied").

Here, the plaintiff essentially concedes that the first and third Howey elements are satisfied.[11] The parties focus their dispute instead on the second element—whether this chimerical investment was in "a common enterprise." Since Howey, the circuits have divided on whether that common enterprise element requires a relationship by which investors pool their funds or other assets (called a horizontal approach), or only a relationship between the investor and the promoter (the vertical approach) and— if the latter—whether the test for vertical commonality is "broad" (satisfied if an investor depends on the promoter's expertise for any profits) or "narrow" (satisfied only if the investor's profits and the promoter's profits are "interwoven," or interdependent). The Loss securities law treatise describes the three approaches and the Circuits that follow them. Louis Loss, Joel Seligman, & Troy Paredes, Securities Regulation (5th ed. 2018), at 1076-77.[12] The First Circuit has held "that a showing of horizontal commonality—the pooling of assets from multiple investors in such a manner that all share in the profits and risks of the enterprise—satisfies the test." SEC v. SG Ltd., 265 F.3d 42, 50 (1st Cir. 2001). But it explicitly reserved judgment on whether a vertical approach is also satisfactory: "[W]e take no view as to whether vertical commonality, in either of its iterations, also may suffice to

---

[11] "The transaction at issue here meets the first, and perhaps third, prong of the Howey test—it was an investment of money, perhaps with the expectation of profits to be derived solely from the efforts of the promoter or a third party." Pl.'s Opp'n to Def.'s Mot. to Dismiss at 3 (ECF No. 91). Even if the plaintiff did not concede them, they clearly are satisfied. The plaintiff says he invested $500,000, and he had no role in how the investment return would be produced, relying solely on the promised efforts of certain of the defendants. As the Complaint says, "Defendant Hearld was to manage the transaction by procuring issuance of the standby letters of credit. Funds were to be deposited and disbursed through his attorney, Defendant Ochoa." Compl. ¶ 21.

[12] According to the treatise, the Third, Sixth and Seventh Circuits adopt the horizontal approach; the Fifth and Eleventh adopt the broad vertical approach; and the Ninth adopts the narrow vertical approach.

satisfy the 'common enterprise' requirement." Id. at 50 n.2. The Loss treatise favors the "narrow" vertical approach. Louis Loss, Joel Seligman, & Troy Paredes, Securities Regulation (5th ed. 2018), at 1076-77 ("The Ninth Circuit's [narrow vertical] approach is the preferable one. It [embraces] *common enterprises* both of a horizontal and of a vertical type whenever some form of profit sharing can be shown.") (emphasis in original).

There are intimations of horizontal commonality in the allegations here. Chase says that he "was victimized by a scheme that Defendants have perpetrated against others. Public records indicate that Mr. Chase is one of multiple victims who have been targeted by the Defendants' standby letter of credit scheme." Compl. ¶ 23. One of the fraudulent documents he includes in his Complaint says that in the transaction, fees are paid to other "participants" (an undefined term), reducing $25 million to the $10 Million Chase says he was promised. Compl. Ex. 2. The plaintiff says that one of the defendants "acknowledges that a number of investors in the standby letter of credit scheme have not received their funds," Compl. ¶ 85, and that the significant amount of money that went into the Florida lawyer's trust account "would seem to suggest investments from other victims of the standby letter of credit scheme." Id. ¶ 86. The Complaint's introductory paragraphs say that the "scheme to defraud Mr. Chase is part of a wider pattern and practice by Defendants that they have carried out on a nationwide scale." Id. at 2; see also ¶¶ 62-63 ("part of a larger scheme," "fraudulently inducing others to invest in purported standby letter of credit transactions"). Paragraph 19 alleges that two of the defendants told the plaintiff that "they had participated in such transactions numerous times before

9

and had never lost money." Id. ¶ 19.  One defendant "expressed confidence about the deal and stated that he was willing to put up some of his own land to secure the deal for Mr. Chase." Id. ¶ 27; see also id. ¶ 35.[13]

Nevertheless, it is true, as the plaintiff argues, that "Defendants never claimed to be pooling Mr. Chase's money with that of other investors in such a manner that all would share in the profits and risks of the enterprise." Pl.'s Opp'n to Def.'s Mot. to Dismiss at 4 (ECF No. 91); Pl.'s Opp'n to Def. Roy's Mot. to Dismiss at 2 (ECF No. 106).  Although I think it is a close call given all the other attributes of this investment transaction, I will assume that the First Circuit, under SG Ltd, would find that horizontal commonality was not satisfied.[14]

I conclude, however, that the representations Chase says the defendants made satisfy both the broad and narrow vertical tests.  As to the broad vertical test, Chase certainly depended on the promoters' expected expertise for any profits.  For the narrow vertical test, Chase's profits and the profits of some defendants were directly related in the Irrevocable 17.5% Success Fee Participation Agreement, Compl. ¶¶ 32-36, and in the $15 million in "fees to participants" that the SBLC Issuance and Delivery Agreement provided for upon

---

[13] The defendants point out that Chase was told to transfer his money to the Florida lawyer's trust account as further evidence of pooling. See Reply at 5 (ECF No. 95).  But nothing in the Complaint shows that Chase should have interpreted that vehicle as a pooling arrangement with other investors.

[14] In Lauer, the defendant argued there was no horizontal commonality because he was the only investor.  The Seventh Circuit did not make a final ruling on whether horizontal commonality was satisfied, because the issue was raised on preliminary injunction and only the probability standard was in play.  The Seventh Circuit did state that "it is the character of the investment vehicle, not the presence of multiple investors, that determines whether there is an investment contract." Id. at 670.

the success of the transaction, Compl. Ex. 2.[15] If horizontal commonality is missing, I conclude that the First Circuit would approve at least the narrow vertical test as the Loss treatise has recommended.[16] In the language of Landreth Timber Co., Chase was not purchasing a commodity for personal consumption; he parted with his money to reap profits from the efforts of others. The scheme he invested in fits within Congress's purpose in enacting the securities laws as described by Reves: "to regulate *investments*, in whatever form they are made and by whatever name they are called."[17] 494 U.S. at 61 (emphasis in original).

In the end, like the Howey Court, I conclude that "all the elements of a profit-seeking business venture are present here. The investors provide the capital and share in the earnings and profits; the promoters manage, control and operate the enterprise. It follows that the arrangements whereby the investors' interests are made manifest involve investment contracts, regardless of the legal terminology in which such contracts are clothed." W.J. Howey Co., 328 U.S. at 300.

---

[15] It may also be reflected in the allegation that "the Conspiracy Defendants stood to share in the proceeds of funds invested in this fraudulent scheme," Compl. ¶ 104, although it is possible that allegation means only that the defendants would share in the profits of the fraud they practiced upon the plaintiff.

[16] That is, it will recognize common enterprises of both a horizontal and vertical type whenever some form of profit sharing can be shown.

[17] The Loss treatise criticizes the horizontal requirement based primarily upon Landreth Timber Co. It states: "By analogy to the Supreme Court's holding that the sale of 100 percent of the stock in a business to one investor is a security, the sale of an investment contract to a single investor, at least in some instances, also should be a security." Louis Loss, Joel Seligman and Troy Paredes, Securities Regulation (5th ed. 2014), at 1071.

## CONCLUSION

I **GRANT IN PART** the motions to dismiss. I **DISMISS** the RICO claims, Counts I and II, in their entirety. I **RESERVE RULING** on the state law claims until I see whether the plaintiff is able to assert diversity jurisdiction successfully. The plaintiff shall file a motion to amend his complaint by June 4, 2019, and the defendants shall respond by June 25, 2019.

I note the dismissed Cloutier defendants' concern about what effect dismissing the RICO claims has on my earlier substantive ruling in their favor and on their deferred claim for attorney fees. I will address that issue once I determine subject matter jurisdiction in connection with the plaintiff's motion to amend his complaint.

**SO ORDERED.**

**DATED THIS 21ST DAY OF MAY, 2019**

/S/ D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**